UNITED STATES DISTRICT COURT
SOUTHERN DISTRIC OF FLORIDA

CASE NO. 05-23260-CIV-GOLD
(96-443-CR-GOLD)

MAGISTRATE JUDGE P.A. WHITE



FILED by _____ D.C.

AUG 0 4 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

ELADIO MUNOZ,

      Petitioner,

V.

UNITED STATES OF AMERICA,

      Respondent.
_____/

**APPEAL TO THE DISTRICT COURT OF THE ORDER ADOPTING THE REPORT AND RECOMMENDATION.  ADDITIONALLY, MOTION FOR RELIEF FROM FINAL JUDGMENT AND JUDICIAL NOTICE OF ADJUDICATIVE FACTS**

COMES NOW, ELADIO MUNOZ, pro se hereafter the Petitioner, and respectfully submits his appeal to the Order adopting the Magistrate Judge's Report and Recommendation (R&R) denying habeas corpus relief.  Additionally, the Petitioner moves this Honorable Court pursuant to Federal Rules of Evidence Rule 201, for judicial notice of adjudicative facts, and Fed. Rules of Civ. Proc. Rule 60(b), for relief from final judgment, based on Petitioner's trial/appellate counsel's, Joaquin Perez, and habeas corpus court appointed counsel's, Philip Horowitz, conflict of interest which was known and withheld by the government, and which violated Petitioner's constitutional rights under the Fifth and Sixth Amendments of the United States Constitution, and in the second

instance, affected the integrity of this habeas proceedings. To this end, the Petitioner petitions this Court to take judicial notice of adjudicative facts pertaining to a federal investigation involving Petitioner's trial/appellate counsel, as outlined in a memorandum by the Drug Enforcement Administration (DEA), and which was withheld by the government. (See Exhibit A, Memorandum titled "Possible Attorney Conflict in the Investigation of Miami Field Division Group 43 Special Agents, "Operation Caliman, " U.S. Department of Justice, Drug Enforcement Administration, by Sandalio Gonzalez, Special Agent in Charge 1, Miami, Field Division)

## I.  **INTRODUCTION**

As matter of introduction, the Petitioner respectfully submits that the cancelation or reversal by Magistrate Judge White of his own ruling ordering an evidentiary hearing followed by the recommendation to deny Petitioner's § 2255, which was adopted by this Court, further compounds and subjects the Petitioner to the continued violation of Petitioner's constitutional rights. Under the Sixth Amendment, the Petitioner has the right to effective assistance of counsel, a formidable adversary free of conflict of interests. Under the Fifth Amendment, the Petitioner has the right to a fair trial...the right to testify on his own behalf, and that no prior convictions obtained by the state in violation of the U.S. Constitution be used against the Petitioner. Namely, convictions that were obtained in state courts without counsel representation. In a nutshell, Petitioner's counsel was acting under a conflict of interest because the same government

-2-

prosecuting the Petitioner was holding the "sword of Damocle" over counsel's head. Petitioner's counsel and the government were the only parties privy to this information. To add insult to the injury, when the Petitioner provided the Memorandum (Exhibit A) to his court appointed counsel in these proceedings (Philip Horowitz) instead of investigating and submitting the documentary evidence to this Court, **Mr. Horowitz asked Magistrate Judge White to order a psychological evaluation of the Petitioner.** Magistrate Judge White agreed, despite noticing the Petitioner to be coherent and rational. Petitioner's trial/appellate counsel, Joaquin Perez, never made an effort to obtain a "sweetheart plea deal" as he was doing for Colombian drug lords, Exhibit A, supra. Furthermore, Petitioner's trial/appellate counsel's actions, Joaquin Perez, may have been against federal laws and the Model of Professional Responsibility, but may have been overlooked by the government in exchange of valuable information and convictions. Moreover, the conduct of the attorney appointed by this Court, Philip Horowitz, affected the integrity of the habeas proceedings when Mr. Horowitz decided to cover-up for the government misconduct in withholding Petitioner's trial/appellate counsel's investigation...or perhaps, by covering up for a colleague who was "parcelling out cases from the Colombian Cartels to him." Thus, Mr. Horowitz also may have had a hidden agenda and personal interest that the investigation and conflict of interest discussed in the Memorandum be kept away from this Court. The Memorandum implies that Petitioner's trial/appellate counsel was part of a scheme to manipulate the system for personal gain. However, the actions described in the Memorandum may have constituted, in addition to unethical

violations, obstruction of justice. Of equal seriousness and import, may have been a government aware of this conduct and the investigation that followed which it did not disclose, and a government which allowed this Court and the Petitioner to walk blindly into a mind field. Wherefore, in order to preserve the integrity of the proceedings the final judgment should be vacated, and an evidentiary hearing should be held to investigate on the record the events that transpired.

## II.   STATEMENT OF FACTS

In order not to be repetitious and in furtherance of judicial economy, the Petitioner will rely on his § 2255's statement of facts and the pleadings thereafter. Including the government's Response. However, the Petitioner is also submitting the following facts pertaining to what appears to be the federal investigation of Petitioner's trial/appellate counsel, Joaquin Perez, by the Drug Enforcement Administration (DEA) and the Federal Bureau of Investigation (FBI). In addition, some of the findings made in the R&R, as relied upon by the government in its Response.

### a).   Petitioner's trial/appellate counsel's conflict of interest which was withheld by the government.

1. It seems that in 1996, at the time of Petitioner's trial Petitioner's trial/appellate counsel, Joaquin Perez, was under federal investigation by a federal task force of DEA and FBI for arranging cases in order to obtain "sweetheart plea deals" for his high profile clients, Colombian drug lords.

2. By May 1999, Special Agent Russell Davis, DEA, had filed a report "spelling" out some of the facts pertaining to Petitioner's counsel's improper or criminal conduct. (Id. at Exhibit A) This information is part of a DEA-6 discussed in the Memoradum (Memo) written by Sandalio Gonzalez, Special Agent in Charge 1, of the Miami Field Division. <u>Id.</u> Most importantly, this information has never been disclosed by the government to the Petitioner or this Court.[1]

3. On June 27, 2000, Special Agent Sandalio Gonzalez, DEA, wrote an internal memorandum addressed to Vicent J. Mazilli, Special Agent in Charge, Miami Field Division, titled "Possible Attorney Client Conflict in the Investigation of Miami Field Division Group 43 Special Agents." <u>Id.</u>

---

1/ In the Response the newly assigned AUSA clearly distanced himself from the former prosecutors by stating that he was not involved in the "underlying criminal prosecution nor the subsequent civil litigation in this case." (See DE-#62, p.1) However, the Petitioner respectfully makes AUSA William T. Zloch, aware that since he has taken over the case, it falls with him the continuing duty to disclose evidence that he has been made aware of which was withheld by the prosecution in previous proceedings. That is, a withholding of the evidence that was knowingly or unknowingly withheld by the prosecution. Such as Exhibit A, DEA-6 by Special Agent Russell Davis, the evidence pertaining to the contacts had by Ruben Oliva, Esq., on behalf of Mercedes Gomez with the U.S. Attorney's Office, or the investigation of Nelson Martin, President of Rosa Medical Center at the time that fraud was committed against the United States by members, officers or employees of the corporation.

4.  Even though the Memorandum is only two pages long, the memorandum provides an overwhelming amount of information and serious implications regarding Petitioner's trial/appellate counsel's actions.  These actions are summarized by Agent Gonzalez's remark of "at the very least an appearance of impropriety," and "As an example, both of these gentlemen [Rodriguez-Varela and Perez] have material information regarding communications between the agents and their clients..."  In other words, Petitioner's counsel was involved in manipulating the judicial system in a way that may have been considered criminal or improper by the DEA.

5. Furthermore, Agent Gonzalez notes that the manipulation of the legal system by Petitioner's counsel and his associate was a secret at <u>sotto voce</u> in the legal community:

> "In sum, I am particularly concerned that we have a pair of defense attorneys, one representing a Caliman defendant [citation omitted], and the other Caliman informant [citation omitted] who may be looking for a **sweetheart plea deal** at the expense of our two agents, and that these two attorneys may in essence be controlling both sides of the equation in furtherance of their defacto partneship." <u>Id.</u>

6.  On August 7, 2006, the Petitioner wrote a letter to his newly court appointed counsel, Philip Horowitz, who was appointed to represent the Petitioner in the scheduled evidentiary hearing

by Magistrate Judge P.A. White. In the letter the Petitioner asked Mr. Horowitz to consider filing a number of motions: "[I]n addition, there are a number of things that I am asking you consider filing: (1) discovery motion pursuant to the Rules Governing § 2255, requesting information pertaining to the investigation conducted by the government that led to the later indictment of the witnesses Idania Cecilia Arias, Mercedes Gomez, and Nelson Martin,[2] used by the government against me at trial; (2) information **of the investigation of my attorney by the government during the course of my proceedings.** It appears that my attorney, Joaquin Perez, was being investigated by the government in the Ochoa case during my proceedings; (3) the filing of subpoenas for Idania Cecilia Arias, Mercedes Gomez, Nelson Martin and AUSA Jennifer Prior." (See Exhibit B) (Emphasis added)

7. The Petitioner then met Mr. Horowitz in FDC Miami, where the Petitioner provided him with the Memorandum now being submitted herein as Exhibit A. Mr. Horowitz did not filed the Memorandum, and did not raise the issue of conflict of interest as requested by the Petitioner. Instead, Mr. Horowitz became very

---

2/ Recently, the Petitioner received <u>new</u> information pertaining to the investigation of Nelson Martin, President of Rosa Medical Center at the time the events transpired, and the contacts/communications had by Mercedes Gomez's attorney, Ruben Oliva, Esquire, with the U.S. Attorney's Office at or before Petitioner's prosecution by the same office. The Petitioner is now awaiting to have physical possession of said documentary evidence and will move the Court in the future to make that evidence part of these proceedings.

concerned as to how the Petitioner obtained the Memorandum, and as noted by the government in the Response, asked the Court to order a psychological evaluation of the Petitioner:

> At the outset of the September 14, 2007 hearing Munoz stated under oath that he wished to discharge court-appointed counsel, Philip Horowitz, on the basis that he failed to subpoena the Assistant U.S. Attorney involved in this trial, as well as, his trial attorney Joaquin Perez, Esquire (DE:46:34). Attorney **Philip Horowitz suggested and Magistrate Judge White agreed, despite Munoz coherent and rational appearance, that Munoz be evaluated regarding his mental competency to go forward with the evidentiary hearing.** (id.)

<u>Id. at Response, DE-62, p. 1-2 (Emphasis added).</u>

Petitioner's request to Magistrate Judge White to discharge Mr. Horowitz was due to Petitioner's inability and frustration of not being able to persuade Mr. Horowitz to raise the conflict of interest supported by the Memorandum. Additionally, Mr. Horowitz would not file subpoenas of the parties involved in the Memorandum, as well as, the AUSA at trial in order to develop the evidence at the evidentiary hearing. To this end, the Petitioner repeatedly asked Mr. Horowitz to do so. (See Exhibit C)

8. Mr. Horowitz's failure to raise the conflict of interest adds more unanswered questions to the pot.

1)- How deep and how far this conflict of interest reached?

-8-

2)-  How did it affect Petitioner's proceedings?

3)-  Did the government knowingly withheld this information?

4)-  Should the government have known?

5)-  Did Mr. Horowitz have a personal interest that this issue and the Memorandum was not brought before the Court and aired before the public's eye **because he was one of the attorneys who had received, was receiving, or wanted to receive clients being "parcelled out" by Mr. Perez?**

6)-  Were Mr. Horowitz's actions just aimed at protecting a member of the "brotherhood"?


These questions can only be answered by an evidenciary hearing where the Petitioner, as well as, as the Court could ask the questions and develop the evidence.


9.  It is clear at this junction, that the Memorandum was timely provided to Mr. Horowitz, and he did not bring it to the Court's attention.   Even worse, when the Petitioner insisted, Mr. Horowitz asked the Court to order a psychological evaluation of the Petitioner in order to declare the Petitioner incompetent. Id.


10.  Furthermore, after a lengthy and complex proceeding Mr. Horowitz filed a five page objection to the R&R, including the face page and the certificate of service page.   The only issue raised in objection was the Magistrate Judge's failure to conduct the scheduled evidentiary hearing.

11. The Petitioner specifically asked Mr. Horowitz to raise the issue of the conflict of interest of his trial/appellate counsel, and in a timely fashion provided Mr. Horowitz with a copy of the Memorandum, Exhibit A. By omitting from these habeas corpus proceedings Petitioner's trial/appellate counsel's conflict of interest when he was specifically asked by the Petitioner to raise such, Mr. Horowitz created another conflict of interest in itself that affected the integrity of these habeas proceedings. Mr. Horowitz in order to conceal or protect some unknown self interests, willfully precluded said conflict of interest claim to be raised in Petitioner's § 2255. See, Gonzalez v. Crosby, supra.


**b).** **Petitioner's trial/appellate counsel willfully withdrew all evidence that would have proven Petitioner's innocence, and willfully failed to present a meritorious alibi defense.**


12. Immediately after the Petitioner learned the accusations charged in the Indictment pertaining to Petitioner's involvement in the kidnapping of Idania Arias and her children, the Petitioner informed his trial/appellate counsel that he [Petitioner] was home the day and at the time the alleged events transpired. Specifically, the Petitioner informed his trial/appellate counsel that approximately at the time the kidnapping occurred he had spoken with Ilvigio Hernandez from his home telephone. Furthermore, that he [Petitioner] resided in Fort Pierce, and that between Fort Pierce and Miami there is a travel time of approximately three hours without the late afternoon traffic.

-10-

Thus, it would have been physically impossible for the Petitioner to be present at the scene of the crime.

13.   At trial, the government's main witness, Ilvigio Hernandez, testified that the afternoon of the kidnapping of Idania Arias and her children he and the Petitioner had been in Miami planing and stalking the victims, and that the Petitioner was present and actively involved at the scene of the crime:

BY AUSA:   What else, if anything, did you do in connection with criminal activity on January 11th, 1996?

A:   Past 4:00 [p.m.] something, almost four o'clock in the afternoon, I received a beep from Eladio Munoz in order--

Q:   I am sorry.  Go ahead.

A:   --in order for me to meet with him to go do something else that had just come in.

***

A:   At that time Eladio [the Petitioner] came by the shop.  He explained to me what was the situation, and I told him to follow me to the airport, so I could drop the car to my wife and go ahead and start surveillance of the new target.

***

Q:   Did you encounter Idania Arias at her home?

A:   Yes, we did.

Q:   What time?

A:   It was probably a little bit after 5:00, maybe ten or fifteen minutes part 5:00 [p.m.].

<u>Id. at Cr-DE#382, p.p. 1248-49, 1254</u>.


14. According to the government, Petitioner's home telephone records for January 11th, 1996, shows that at 2:50 p.m. a call was placed to Ilvigio Hernandez's telephone. This was the same day of the kidnapping of Idania Arias:


BY AUSA: Briefly, Your Honor.  I agree with Perez when he says that regarding December 24th and 25th, he didn't know what the testimony would be so he couldn't give us an alibi notice. I think he is right about that.

But he didn't really address the point on January 11th that there is a **phone call at 2:50 in afternoon from Fort Pierce to Miami. That he did have notice because that is right there in the Indictment.**  And what he says was, Your Honor, I am not concerned about it **because it is not the highlight of my defense.** That doesn't answer the question of whether he is putting it in as an alibi or not.  It may not, in his mind, be highlight, but we need to address that issue.

And he says, I shouldn't have to proffer. Well, the point is that technically the Court has the discretion to exclude this stuff, so if the Court wants to make a condition of putting it in-and I am not asking the Court to do that.  **I am asking the Court to exclude it...**


<u>Id. at Cr-DE#429, p. p. 3072, 3073 (Emphasis added</u>.


15. In the above proceeding the government was arguing a motion that it had filed for exclusion of Petitioner's home telephone records, due to Petitioner's trial/appellate counsel

<u>willful</u> late submission of the evidence, in violation of the reciprocal discovery rules.  (See Cr-DE#405)

16.  Given the evidence which the government was seeking to exclude, there are no logical or practicable explanations for Petitioner's trial/appellate counsel's waiver of an alibi defense. Other than Petitioner's trial/appellate counsel's intentions of currying favor for the government in order to obtain "sweetheart plea deals" for his high paying Colombian drug lords clients... or looking for leniency because now the same government prosecuting the Petitioner was investigating him.

17.  This Court also recognized that the home telephone records would have placed the Petitioner at home the day and time the stalking and kidnapping was committed.  Certainly, it would have proven that it was impossible for the Petitioner to leave Fort Pierce to Miami at 2:50 p.m., at the peek of the rush hour, and be on time for the stalking and the kidnapping that, according to Ilvigio Hernandez's testimony, occurred that same afternoon at 5:00 p.m..  Indeed, Petitioner's home telephone records show that the Petitioner had placed a phone call to Ilvigio Hernandez that same afternoon from Fort Pierce which is located approximately 150 miles from Miami. <u>Id.</u>:

THE COURT: Now, there is no question those documents are
          subject to reciprocal discovery.  I don't
          believe I have heard Mr. Perez indicate
          otherwise.

-13-

***

This is not a situation where these matters were not known to your client, known as documents available, should have been known to you in that they certainly involve at least the January records, the very acts in question, and therefore, should have been available to be turned over as reciprocal discovery in a timely fashion, **and particularly these are matters on the 11th, which touch on a question of almost alibi, if not for the time period of the kidnapping per se, certainly whether or not your client was involved in the stalking that has been subject of testimony, and could if, in fact, your client was in Ft. Pierce, timely gotten down to participate.**

So, although this particular issue **on January 11th,** may not be an alibi per se **because you are not claiming that your client was in Ft. Pierce at the exact time that the matter occurred,** it certainly is right on the fringe and cusp and **gives even more weight to the reasons why it needed to be turned over as part of reciprocal discovery.**

***

Without you offering what I consider to be **a valid explanation** as to why these records were not turned over, it raises in **my mind the question of whether this omission was willful and motivated** to obtain a tactical advantage that would minimize the effectiveness of the Government's investigation and ability to adduce rebuttal evidence.

Id. at Cr-De#429, p.p. 3269, through 3274, (Emphasis added.

18.  The Court found that Petitioner's trial/appellate counsel's omission or late discovery was <u>willful</u> and <u>blatant</u>, and granted the government's motion for exclusion of the evidence. (<u>Id.</u> at Cr-DE#429, p. 3272)

-14-

19.   Perhaps  just  as  bad  as  Petitioner's  trial/appellate
counsel's  willful  and  blatant  violation  of  the  discovery  rules  was
his <u>withdrawal</u> of  all  of  the  evidence  he  had  intended  to  submit  to
prove Petitioner's innocence:


THE COURT: Mr.  Perez  [Petitioner's  counsel],  what  would
            be  the  foundation,  in  any  event,  that  you
            would  use  to  get  in  the  January-- let's talk
            about  the  **January  11th  phone  call  because
            that's  the  one** --

**MR. PEREZ:**  Let me make this brief.  **I am withdrawing all
            the  evidence  that  I  intended  to  offer.**
            Hopefully that will be the end of the inquiry
            at  this  particular  point.  **I am not offering
            any evidence.**  The issue is moot.

THE COURT:  All  right.  I  am  satisfied  to  leave  it  at
            that.


<u>Id. at Cr-DE#429, p.p. 3274, 3275</u>.


c).   <u>Petitioner's  trial/appellate  counsel  did  not  procure  a
an  advantageous  plea  deal  as  he  had  been  doing  for  high  paying
clients  that  were  Colombian  drug  lords  clients.   In  other  words,  a
"sweetheart  plea  deal</u>."


20.   The  R&R  makes  a  conclusory  finding  that  "[T]he  court
finds  incredible  the  movant's  after-the-fact  representation  that
he  would  have  pleaded  guilty  had  he  been  properly  advised  by
counsel  in  this  regard.   The  movant  was  aware  of  the  consequences
that  such  plea  would  have  at  sentencing."   The  R&R  also  finds:

> To the contrary, the government has responded
> that no plea offer was ever extended to the
> movant, nor the government ever sought or
> welcome cooperation from the movant.

(Id. at Civ-DE#46, p.p. 29, 30)  Nothing in the record supports

this conclusion.  Hindsight is always 20/20.  Moreover, when no

evidentiary hearing was held, and where Petitioner's

trial/appellate counsel had been able to negotiate "sweetheart

plea deals" with the government for Colombian drug lords facing

multiple life sentences.  Certainly, nor the government or the R&R

can suggest that there are not some of these ex-drug lords walking

freely the streets of South Florida after serving very short

sentences.  Moreover, some of these drug lords that were facing

multiple life sentences (who were also known killers in Colombia)

are now awaiting to be released after serving very short sentences

as the result of sweetheart plea deals.  Surely, some of these

drug lords have been represented by Petitioner's trial/appellate

counsel.


21.  The R&R also concludes that the Petitioner failed to

demonstrate that he ever expressed his desire to plea guilty.  In

addition, that Petitioner's challenges to his convictions

demonstrate that he has maintained his innocence.  Id.  Assuming

but not conceding that was the case, the R&R fails to take into

consideration that the Petitioner could have entered into a nolo

contendere plea.  Moreover, if Petitioner's trial/appellate

counsel would have been as aggressive as he has been known to be

-16-

on behalf of the Colombian drug lords. However, since the evidentiary hearing was cancelled, the R&R's conclusion here are bare bone conclusions.

      **d).**   **The Brady, Giglio, violations, Petitioner's trial/appellate counsel's failure to aggressively pursue, investigate the issue is the result of his conflict of interest and desire to curry favor for the government. In addition, Petitioner's Court Appointed counsel for these proceedings failure to file objections are also the product of conflict of interest.**

    22.  The R&R does not dispute that evidence was withheld by the government. However, the R&R exempts the government's violation as follow:

> Whether defense counsel was apprised that Mercedes Gomez was also the subject of a federal prosecution for medicare fraud [citation omitted] is of no import given the overwhelming evidence at trial to support the movant's convictions. The movant also cannot establish that the information was material and would have affected the outcome of the trial. Under these cricumstances, the movant cannot establish deficient performance or prejudice arising from counsel's failure to pursue this issue.

<u>Id. at Civ-DE#46, p.26.</u>

23.  At trial, Ilvigio Hernandez, the most important witness presented by the government admitted that the **sworn** statement or deposition he gave to Detective Joseph Rodriguez, Metro-Dade Police Department, Narcotics Bureau, on January 12, 1996, was completely false.  This was a thirty seven (37) page sworn statement. Because this was a duly sworn statement, by Ilvigio Hernandez admitting that it was completely false he was admitting that he had committed perjury.  It should be noted, that before Ilvigio Hernandez admitted his perjury to state law enforcement agents, he committed perjury regarding the same issue in his sworn testimony in this proceedings by denying he had lied in regards to that same sworn statement. Compare in the first instance where Hernandez denied having lied to <u>anybody</u>, and in the second instance where Ilvigio Hernandez <u>admitted</u> his perjury:


DEF. ATT.:   Sir, the fact is that over the course of the last year-and-half, you've lied to everyone about this case, sir.  Would that be an accurate statement?

HERNANDEZ:   No, sir, I haven't lied to anybody during the past year-and-half about this case.

                        ***
DEF. ATT.:   Sir, you didn't have any problems lying to Detective Rodriguez immediately after you were arrested, correct?

HERNANDEZ: **Well, yeah, I lie to him**


<u>Id. at Cr-DE#382, p.p. 1340, 1371</u>.


This is part of the <u>overwhelming</u> evidence referred to by the R&R. The complete perjured testimony of Ilvigio Hernandez.  Most

importantly: in which of the proceedings Ilvigio Hernandez lied, in the Florida State's sworn testimony or at Petitioner's federal tria? However, it is interesting to note that Ilvigio Hernandez was never charged with obstruction of justice or with perjury by federal or state authorities. Was this part of the inducement to cooperate?

24.   Nelson Martin and Mercedes Gomez, husband and wife and owners of Rosa Medical Center, were victims of kidnapping and important witnesses for the government. However, Mercedes Gomez and Nelson Martin were being investigated by the FBI for fraud against the United States. Most notably, Mercedes Gomez and Nelson Martin filed a false police report regarding the firearms and a car that were allegedly to be stolen in the kidnapping. The car with the firearms inside was found in the same shopping plaza and the same parking space where Mr. Martin had parked the date of the alleged kidnapping. (See also n.2, supra) Neither, Nelson Martin or Mercedes Gomez were charged with the filing of a false police report. Most importantly, notwithstanding an array of suggestive techniques used by the law enforcement agents, neither Mercedes Gomez nor Nelson Martin, identified the Petitioner as one of the kidnappers. (See Cr-DE#315)

25.   Idania Arias, victim of the kidnapping, was the other important witness for the government. However, Idania Arias had something in common with Mercedes Gomez and Nelson Martin, she was also being investigated by the FBI for having committed fraud

against the United States.   Idania Arias and her husband, Jose
Arias, were indicted and sentenced after the trial.   As the result
of Idania Arias's erroneous identification of one of the
perpetrators of her kidnapping, an innocent man spent over a year
in federal jail.   Humberto Munoz was that innocent man that was
erroneously identified by Idania Arias.   But this is not the only
error committed by Idania Arias.   Idania Arias like Ilvigio
Hernandez lied...committed perjury at Petitioner's trial or at the
Florida State's sworn deposition.   At the sworn deposition Idania
Arias testified that she had never seen the Petitioner, and that
her youngest son was the only one who had allegedly seen the
Petitioner.   In addition, Idania Arias had stated in the sworn
deposition that she knew her son had seen the Petitioner
(allegedly to be "El Negro) because the "police told her."   (See
Cr-DE#392, p. 1837 thru 1844) However, at the trial Idania Arias
was able to identify the Petitioner despite having admitted before
that she had never seen the Petitioner.   In addition, Idania Arias
never picked the Petitioner from the arrays of photo lineup shown
to her by law enforcement agents. Obviously, Idania Arias lied or
committed perjury at one of the proceedings; at the Florida
State's sworn deposition, or in federal court.   Moreover, this
part of the "overwhelming" evidence cited by the R&R findings.


     26.   The R&R did not follow   the new elaborated Brady
materiality test by Kyles v. Whitley, 514 U.S. 131 L.Ed 2d 490.
115 S.Ct. 1555 (1995).   Under Kyles, the use of the sufficiency of
the evidence (as stated in the R&R as "overwhelming evidence)
is error.

27.   Petitioner's trial/appellate counsel had been apprised of Idania Arias's believed to be fraudulent affairs against the United States, and that she was under investigation and possible indictment by the same government prosecuting the Petitioner.   At trial, Petitioner's trial/appellate counsel learned that Mercedes Gomez and Rosa Medical Center were also the targets of federal investigation for fraud against the United States.   Nelson Martin was Mercedes Gomez's husband, and was also the president of Rosa Medical Center.   Ruben Oliva, Esq. at that time was representing Mercedes Gomez or/and Nelson Martin.   Petitioner's counsel did not conduct an independent investigation of any the individuals or their businesses.   Not even after learning that they were targets of federal investigation.   Petitioner's trial/appellate counsel's conduct its not surprising given the facts that would make him inclined to curry favor for the government, i.e., an investigation of his shady dealings on behalf of Colombian drug lords for personal gain.

28.   Petitioner's Court Appointed counsel in these proceedings appeared to have also a conflict of interest which precluded him from filing a conflict of interest issue against one of his colleague and against the government.   Additionally, he failed t file meritorious objections pertaining to an erroneous application of law, infra, and filed only one (1) objection to the R&R.   It may very well be that he was also receiving clients from Petitioner's trial/appellate counsel, as it has been hinted by the Memorandum, Exhibit A.   In the Memorandum, supra, Petitioner's trial/appellate counsel was "parcelling out" cases or clients.

-21-

## III. <u>ARGUMENT</u>

### III(a).  <u>RELIEF FROM FINAL JUDGMENT UNDER RULE 60(b)</u>

As a principle of law the United States Supreme Court has firmly established that Rule 60(b) has an unquestionably valid role to play in habeas cases.  In <u>Gonzalez v. Crosby</u>, 545 U.S. 524, 162 L.Ed. 2d. 480, 125 S.Ct. 2641 (2005), the Supreme Court held that the filing of a motion under Rule 60(b) is appropriate in order to avoid "[S]ome defect in the integrity of the federal habeas corpus proceedings...". <u>Id</u>. In <u>Banks v. U.S.</u>, 167 F.3d 1082 (7th Cir. 1999), the Seventh Circuit held that "[R]ule 60(b) is, however, an appropriate means to bring a claim that the conduct of counsel affected the integrity of the court's habeas proceedings."

In the instant case, the Petitioner is raising for the first time a conflict of interest issue pertaining to both of the attorneys that have represented the Petitioner before this Court. First and foremost, Petitioner's trial/appellate counsel, Joaquin Perez, had engaged on unethical practices, and possibly, criminal conduct at the time counsel was representing the Petitioner.  An investigation was initiated as the result of that conduct by federal enforcement agencies, Exhibit A, supra.  This investigation of Petitioner's trial/appellate counsel was withheld by the government.  Second, the Petitioner learned of this investigation after the trial and appellate proceedings were over, and after the Petitioner had filed his initial habeas proceedings. By the time Petitioner discovered the Memo, this Court had already appointed Philip Horowitz, Esq., to represent the Petitioner at an

-22-

scheduled evidentiary hearing.  The Petitioner then diligently provided Mr. Horowitz the DEA Memo containing the information pertaining to Petitioner's trial/appellate counsel's investigation, Exhibit A, supra,.  The Memo outlined what appears to be a large investigation of Petitioner's counsel and his associates.  Mr. Horowitz did not file the documentary evidence (Memo), did not subpoena any of the persons mentioned in the Memo, did not file any discovery motion asking for additional information, and did not petition the Court to enlarge the evidentiary hearing as to the issue of conflict of interest. Instead, Mr. Horowitz asked this Court to order a psychological evaluation of the Petitioner.  This Court agreed despite having noticed that the Petitioner appeared coherent and rational.

    Mr. Horowitz's actions created another conflict of interest because Mr. Horowitz chose to ignore the Memo and Petitioner's requests to include this issue in his habeas corpus. (See Exhibit B)  As a result, the integrity of the proceedings are now highly questionable.  Indeed, Mr. Horowitz may have been one of the attorneys receiving clients from Joaquin Perez and his associates. Further, it may have been that Mr. Horowitz did not want to be involved in having to subpoena and question a colleague's conduct in front of the public's eye and before this Court.  Thus, Mr. Horowitz's conduct affected the the integrity of the court's habeas proceedings.  Gonzalez v. Crosby, supra, Banks v. U.S., supra.  Moreover, while concealing the investigation, the government stayed stoically holding the "sword of Damocle" over Petitioner's counsel's head.  Therefore, Rule 60(b) is the

appropriate means to raise the above issues, and an evidentiary hearing in this regard is consistent with the directions and principles established by the Supreme Court.

### III(b).   JUDICIAL NOTICE OF ADJUDICATIVE FACTS

Judicial notice may be taken where there is no dispute as to authenticity of materials considered but is limited to law, legislative facts, or factual matters that are incontrovertible. Oneida Indian Nation of N.Y. v. State of N.Y., 691 F.2d 1070 (1982) Ovrld. on other grounds in Coyuga Indian Nation v. Pataki, 413 F. 3d 266 (2nd Cir. 2005). Furthermore, under 201(f) judicial notice may be taken at any stage of the proceedings.

In the instant case, the Petitioner is respectfully asking this Honorable Court to take judicial notice in the form of the Memo, Exhibit A, supra, drafted by the Drug Enforcement Administration, Department of Justice, pertaining to the investigation of the alleged corruption of its own agents and the involvement of Petitioner's trial/appellate counsel, Joaquin Perez, and his associates. In addition, the Petitioner is also asking this Court to take judicial notice of Petitioner's court appointed counsel's, Philip Horowitz, actions in order to avoid the filing of the Memo that was timely provided to Mr. Horowitz by the Petitioner, and as evidenced by Petitioner's letter dated August 7, 2006, Exhibit B, and Petitioner's Affidavit, Exhibit C. This documentary evidence submitted herein pursuant to Fed.R.Ev. Rule 201 is indisputably authentic, and incontrovertibly in reference to an investigation by a task force of the Drug

-24-

Enforcement Administration pertaining to possible criminal conduct of its own agents and Petitioner's trial/appellate counsel.  Thus, appropriate under Rule 201.

### III(c).

**PETITIONER'S TRIAL/APPELLATE COUNSEL WAS ACTING UNDER AN ACTUAL CONFLICT OF INTEREST AND IN ORDER TO CURRY FAVOR WITH THE GOVERNMENT KNOWINGLY AND WILLFULLY WAIVED DEFENSE STRATEGY THAT WOULD HAVE DEMONSTRATED PETITIONER'S INNOCENCE**

In conflict of interest claims it is well settled that "[I]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 355, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333 (1980).  However, the Supreme Court noted that "a defendant who shows that a conflict of interest actually affected his representation need not demonstrade prejudice in order to obtain relief."  Id. at 446 U.S. 349-50.  Thus, there is no per se rule of prejudice in all cases involving potential conflicts of interest, but instead only a rule of presumptive prejudice where an attorney actively represented conflict of interests, and ..."actual conflict of interest that adversely affected the lawyer's performance." Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984).

In Freund v. Butterworth, 165 F.3d 839 (11th Cir. 1999)(en banc), the Eleventh Circuit discussed the two-part Cuyler test,

for reviewing claims involving conflict of interest. First, the Court noted that "[a]ctual conflict occurs when a lawyer has 'inconsistent interests.'" Id. at 859(Emphasis in original) Further, this Court stated that in order to prove that "actual conflict" hindered the defendant's lawyer's performance, the defendant "must make a factual showing of inconsistent interest" or to point to "specific instances in the record" to suggest an actual impairment of his her interests. Freund, 165 F.3d at 859, citing Smith v. White, 815 F.2d 1401, 1404 (11th Cir. 1987); Oliver v. Wainright, 782 F.2d 1521, 1524-25 (11th Cir 1986) Second, where a defendant carried the burden of showing an actual conflict of interest, a court must consider whether the conflict adversely affected his representation. Id.

Furthermore, in Freund, supra, the Eleventh Circuit explained that a defendant must satisfy three elements in order to prove adverse effect:

1). he must point some plausible alternative defense strategy or tactic that might have been pursued;

2). he must demonstrate that the alternative strategy or tactic was reasonable under the facts. Because prejudice is presumed, see Strickland, 466 U.S. at 692, 104 S.Ct. 2052, the petitioner "need not show that the defense would necessarily have been successful if [alternative strategy or tactic] had been used," rather the only need to prove that the alternative strategy "possessed sufficient substance to a viable alternative;"

-26-

3).  He  must  show  some  link  between  the  actual
conflict  and  decision  to  forgo  the  alternative
strategy  of  defense.   In  other  words,  he  must
establish  that  the  alternative  defense  was
inherently  in  conflict  with  or  not  undertaken
due  to  the  attorney's  other  loyalties  or
interests.

Id. at Freund, 165 F.3d at 860, citing Fahey, at 769 F. 2d 836
(Emphasis in original.

ACTUAL CONFLICT OF INTEREST:  From the outset of this trial
Petitioner's  trial/appellate  counsel  was  representing  the
Petitioner  under  an  actual  conflict  of  interest  which  adversely
affect  the  Petitioner.   Petitioner's  trial/appellate  counsel  was
the  target  of  a  federal  investigation  by  a  task  force  acting  under
authority  of  the  same  U.S.  Attorney's  Office  prosecuting  the
Petitioner  for  the  possibility  of  having  "'[c]onjured  phony
cooperation  deals'  with  indicted  and  suspected  Colombian  drug
lords."  (See  Exhibit  A,  herein  ¶2,  supra)(Emphasis  in  original)
In  sum,  Petitioner's  trial/appellate  counsel  "controlled  both
sides  of  the  equation"  and  was  playing  in  both  sides  of  the  fence.
Id.   In one side Petitioner's trial/appellate counsel represented
the  government's  informants,  and  in  the  other  (in  the  same  case)
represented  the  defendants.   Id.   Thus,  profiting  from  both
parties.   More  serious  is  the  Memo's  description  of  Petitioner's
trial/appellate  counsel's  manipulation  and/or  the  arranging  of
federal  cases  for  self  gain.   That  is,  according  to  Sandalio
Gonzalez,  DEA  Special  Agent  in  Charge  I,  Miami  Field  Division,
Group  43,  Petitioner's  trial/appellate  counsel  had  been  (and

continued being at that time) under investigation by at least, Special Agent Russell Davis, DEA, for his possible involvement in phony cooperation deals and the devising of a plan to blame law enforcement officers for stealing ten kilograms of cocaine. Id The Memo also describes Petitioner's trial/appellate counsel's extraordinary efforts, which may have been beyond legality, to obtain "sweetheart plea deals perhaps at the expense of two DEA Agents." In this regard, Petitioner's trial/appellate counsel and his clients were targets of a federal investigation, or were "material witnesses to the investigation and any subsequent charge involving the two DEA agents." Id.  In another case where Petitioner's trial/appellate counsel and his associate represented defendants, Special Agent Dan Bruce told Special Agent Gonzalez that the "circumstances involving the actions of these two lawyers in that particular case were in his opinion "suspicious." Id.

In addition, according to the Memo Petitioner's trial/appellate counsel was known in the legal community to be parcelling out cases to other attorneys. Id. Thus, it is apparent that Petitioner's trial/appellate counsel had high connections with Colombian cartels. These high connections landed counsel an array of Colombian drug lords who wanted to deal with the U.S Government. The cooperation seems to have included surrendering themselves, forfeiting large amounts of money, giving up drug routes, properties, intelligence about their peers, etc.. Thereby, obtaining sweetheart pleas deals. The latter one appeared to have made Petitioner's trial/appellate counsel famous

with the cartels.

The Memo further describes an attorney with callous disregard for his ethical obligations who acted unscrupulously for the greet of money.

However, at the time of Petitioner's trial, Petitioner's trial/appellate attorney's good streak had ran out and was now being investigated by the same government he had been holding hands with. This was also the same government prosecuting the Petitioner. Moreover, Petitioner's trial/appellate attorney was now in danger of joining his clients at the Federal Detention Center of Miami. Thus, acting under the burden of having the same government prosecuting the Petitioner holding the "sword of Damocle" over his head. As a result, Petitioner's trial/appellate counsel wanted to curry favor with the government, and willfully and blatantly submitted late Petitioner's exculpatory evidence. Furthermore, Petitioner's counsel withdrew all evidence intended for Petitioner's defense. Amongst the evidence, Petitioner's home telephone record that would prove that Petitioner had made a call the date and time that the Indictment and testimony was placing the Petitioner stalking the victims and at the scene of the crime. This Court found itself trying to find an explanation for Petitioner's counsel's negligence. "[W]ithout offering what I consider to be a **valid explanation** as to why these records were not turned over, it raises in my mind the question of whether this omission was willful and motivated..." (See, Cr-DE#429, p.p. 3269

through 3274, herein ¶17, supra)   This Court then found that the
late disclosure by Petitioner's trial/appellate counsel was
**willful and blatant.**  Id. In Fonworth v. Wainright, 516 F.2d 1072,
1080 (5th Cir. 1975), this Court cautioned that:

> It must be remember that in cases of conflict
> of interest, the conflict does not always
> appear fullblown upon the record, since
> counsel may throughout endeavor to reconcile
> the conflict.

Fonworth, at 1080, citing Austin v. Erickson, 477 F.2d 620, 626
(5th Cir 1973) (Emphasis in original).

In the instant case the Court even though perplexed by
Petitioner's trial/appellate counsel's negligent actions, was
right on point in concluding that Petitioner's trial/appellate
counsel could not offer a valid explanation for his negligent
conduct.  As a result, and as hard pressed as it may have been for
the Court, the Court was left with no other choice but to exclude
evidence that in its view had the potential to prove that
Petitioner was not present at the time and places that had been
subject of testimony and in the Indictment:

> ...and particularly these are matters on the
> 11th [January 11th, the day of kidnapping],
> which touch on a question of almost alibi, if
> not for the time period of the kidnapping per
> se, certainly whether or not your client was
> involved in the stalking that has been subject
> of testimony, and could if, in fact, your
> client was in Ft. Pierce, timely gotten down
> to participate.

So, although this particular issue on January 11th, <u>may not be an alibi per se</u> <u>because you are not claiming that your client</u> <u>was in Ft. Pierce at the exact time that the</u> <u>matter occurred</u>....

Without you offering what I consider to be a <u>valid</u> explanation as to why these records were <u>not</u> turned over, it raises in my mind the question of whether this omission was <u>willful</u> and motivated to obtain a tactical advantage that would minimize the effectiveness of the Government's investigation and ability to adduce rebuttal evidence.

<u>Id. at Cr-DE#429, p.p. 3269 through 3274 (Emphasis added)</u>

Why counsel did not want the evidence showing that at the day and time of the kidnapping the Petitioner was at home, that he had made a telephone call from his home telephone, that counsel had been told by the Petitioner from the outset about this information, that counsel was not using an alibi defense, and that counsel willfully and blatantly submitted this evidence late knowing as a professional that the consequence of his actions would result in a sanction that would prevent the evidence to be submitted, it seemed to be an enigma for this Court...as this Court summarized it "...may not be an alibi per se, **because your are not claiming that your client was in Ft. Pierce at the time that the matter occurred...**" <u>Id.</u> (Emphasis added) This boggled the mind. Moreover, when counsel withdrew all evidence intended for Petitioner's defense. (See Cr-DE#429, p.p. 3269, 3275) However, the explanation for the enigma is quite clear now, and its not a valid explanation: "Petitioner's trial/appellate counsel had a conflict of interest directly affecting his performance

-31-

because he wanted the government to know that he was still a good ally, and wanted the government investigating him to have that in mind when making the decision to whether to prosecute him or not." Thus, he was sacrificing the lamb to obtain forgiveness for his sins.

Moreover, it is clear that Petitioner's trial/appellate counsel was acting under an actual conflict of interest which hindered his performance, and the record is replete with specific instances to suggest and actual impairment of Petitioner's interests. Not limited to: (1) counsel was being investigated by various federal law enforcement agencies at same time he was representing the Petitioner for his involvement with in the conjuring of phony cooperation deals for Colombian drug lords, and the devising of a plan to falsely accuse DEA agents of stealing 10 kilograms of cocaine incidents, (2) counsel was being investigated by the same prosecution office prosecuting the Petitioner; therefore, had sufficient reason to curry favor for the government, (3) counsel and his associate may have provided debriefing or information about his clients to the agents involved in the investigation because he was considered a material witness to the investigation (Id. at Exhibit A), (4) counsel, as explained in the Memo, was playing both sides of the equation (Id.), (5) counsel was parcelling out clients to hide his conflict of interests (Id.), (6) counsel willfully and blatantly failed to disclose exculpatory evidence pursuant to the reciprocal discovery Order, and as the result of his willful negligence the evidence

was excluded by this Court (Id.), (7) following the exclusion of the evidence by this Court counsel further withdrew all evidence intended for demonstrating Petitioner's innocence (Id.), (8) counsel willfully and blatantly waived a meritorious alibi defense that the government fought against with tooth and nails in order prevent its admission (Id.), (9) by foregoing the alibi defense, counsel relieved government of its burden of proof, particularly giving the extraordinary nature of the evidence for the alibi defense that counsel willfully abandoned and withdrew, (10) counsel failed to give notice of an alibi defense, (11) counsel failed to investigate once he learned that the witnesses testifying against the Petitioner were under investigation and possible indictment for committing fraud against the United States of America, (12) counsel failed to timely object at sentencing to the use of state convictions that were obtained without counsel representation, therefore, waived the issue for direct appeal, (13) counsel misstated to the Court whether Petitioner was going to testify on his own behalf... by stating that the Petitioner **did not want to testify** and this meant that he was not <u>actually going</u> to testify; in addition, had Petitioner testified on his own behalf it would have testified that he was home January 11th, 1996, and did not travel to Miami. Thus, obviously in conflict with and against trial/appellate counsel's own hidden agenda.

ADVERSE EFFECT: According to the Eleventh Circuit Court of Appeals' prevalent law in conflict of interests cases, once the defendant overcomes the burden of showing an actual conflict of

interest, a court must consider whether the conflict adversely affected his representation.  _Freund_, supra, at 860.  There the Court explained that in order to prove adverse effect a defendant must satisfy three elements, _Freund v. Butterworth_, supra, at 860.  Here, the record stands out for itself, and the Petitioner can easily satisfy the three elements.  To this end, Petitioner restates the above actual conflict of interests, supra.  In addition, the Petitioner includes the following:

ELEMENT ONE, supra:  Petitioner's counsel knowingly and willfully did not pursue a meritorious alibi defense supported by extraordinary evidence, infra.

ELEMENT TWO, supra:  This alibi defense was very reasonable and it is proven by a government who vigorously fought hard with tooth and nail to prevent its admission, "...there is a phone call at 2:50 in the afternoon from Fort Pierce to Miami.  That he [Petitioner's counsel] have notice because is right there in the Indictment.  And what he says was Your Honor, I am not concerned about it because it is not the highlight of my defense." (Id. at ¶14 herein, supra) The time that the government was making reference to, 2:50 p.m., was because its witnesses testified that the kidnapping occurred at 5:00 p.m. and the Petitioner resided in Fort Pierce.  Approximately 150 miles from Miami.  Thus, impossible for the Petitioner to leave Fort Pierce in the afternoon rush hour and be on time for the kidnapping at 5:00 p.m..  Moreover, the record here shows this Court somewhat

perplexed by counsel's actions in this regard. Particularly because this Court notice that the evidence submitted late by counsel touched on the alibi defense. (Id., ¶17 herein, supra.)

ELEMENT THREE, supra: The link between counsel's conflicts and his decision to forgo the alibi defense is easily established and is inherently in conflict or not undertaken due to counsel's other loyalties or interest. Counsel was now being investigated by the same office prosecuting the Petitioner. Counsel went to extreme measures to insure that the government was release from its burden of prove by willful and blatant late submission of exculpatory evidence and then withdrew all evidence intended for Petitioner's defense. Obviously, counsel was currying favor for the government to save his own neck. The government was now holding the sword of Damocle over counsel's head. Therefore, counsel had other loyalties and interests. In addition, Petitioner's trial/appellate counsel had his reputation and may be his life at stake. Not only because counsel was possibly facing incarceration and losing his license, but also the danger was knocking at his door now. He had been dealing with the Colombian drug cartels and the high paying Colombian drug lords clients whose deals were now swinging now from a trapeze, and Petitioner's trial/appellate counsel was the safety net. If Petitioner's trial/appellate counsel lost his liberty, his license, or his good standing with the U.S. Attorney's Office, counsel was in danger of may be losing his life at the hands of his Colombian drug lord clients.

-35-

III(d).

## COUNSEL FAILED TO EXPLORE POSSIBLE PLEA NEGOTIATIONS AS THE RESULT OF HIS CONFLICT OF INTEREST

"[E]xploring possible plea negotiations is an important part of providing adequate representation of a criminal client, and this part is easily precluded by conflict of interest." U.S. v. McLain, 823 F.2d 1457, 1464 (11th Cir. 1987), citing Halloway v. Arkansas, 435 U.S. 475, 490, 98 S.Ct. 1173, 1181, 55 L.Ed 2d 426 (1978). In McLain, like in the instant case, counsel representing the defendant was under investigation by the same prosecutors prosecuting the defendant. To the extend that counsel did not aggressively pursued a plea agreement, the Eleventh Circuit stated that "[T]his actual conflict of interest adversely affected the competency of Johnson's [counsel for defendant] representation of Sher [defendant]. Johnson's competence was **most lacking** in the area of plea negotiations." Id. 823 F.2d at 1464. Furthermore, this Court noted that "...Johnson could have gone over United States Attorney's Merkle's head to the Justice Department like he did later when he was indicted." Id.(Emphasis in added)


In the instant case, the R&R noted that the government stated in its response that it was not interested in any plea negotiations with the Petitioner. (See CIV-DE#46, p.p. 29, 30) Hindsight is always 20/20. Nevertheless, Petitioner's trial/appellate counsel seems to have been famous for his sweetheart plea deals on behalf of Colombian drug lords. In contrast the counsel in McLain conducted plea negotiations in one case (his own) after the facts. The record here describes that

Petitioner's trial/appellate counsel had been engaging and obtaining these sweetheart plea deals in a regular basis before, during, and most likely, after Petitioner's trial. (Exhibit A) Specially, and may be, for himself. Thus, the record here clearly shows an attorney who was very able in conducting plea negotiations, but very ineffective or inadequate in his plea negotiations on behalf of the Petitioner. Petitioner's trial/appellate counsel's inadequacy was due to the conflict of interest created by a federal investigation of his actions when representing other defendants. Similarly, like in McLain, supra, exploring plea negotiations was part of providing effective representation, and this part was easily precluded by a conflict of interest.

### III(e).

**COURT APPOINTED COUNSEL IN THE HABEAS CORPUS PROCEEDINGS CREATED AN ACTUAL CONFLICT OF INTEREST WHEN HE FAILED TO RAISE THE ISSUE OF PETITIONER'S TRIAL/APPELLATE COUNSEL'S CONFLICT OF INTEREST.**

This Honorable Court appointed attorney Philip Horowitz to represent the Petitioner in these proceedings. Upon receiving the notice of this Court's appointment, the Petitioner wrote a letter to Mr. Horowitz. In the letter, the Petitioner specifically asked Mr. Horowits to consider filing a number of issues and subpoenaing a number of witnesses. The Petitioner also provided Mr. Horowitz with a copy of the Memo (Exhibit A), and amongst the persons the Petitioner wanted to subpoena was his trial/appellate counsel. (See Exhibit B) The Petitioner asked Mr. Horowitz to subpoena his

trial/appellate counsel, "[I]n addition, there are a number of things that I am asking you consider filing," and number two was "(2)information of the investigation of my attorney by the government during the course of my proceedings. It appears that my attorney, Joaquin Perez, was being investigated by the government in the Ochoa case during my proceeings." Id. The Petitioner provided Mr. Horowitz with a copy of the Memo herein discussed, Exhibit A, in two different occasions.

However, Mr. Horowitz instead of raising the issue and asking for additional discovery, asked this Court to submit the Petitioner to a psychological evaluation. This Court agreed, despite having found that the Petitioner appeared to be coherent and rational. (See CIV-DE#62, p.p. 1-2, the government's Response) This raises a very legitimate question as to Mr. Horowitz' loyalties and interests. Specially, because now the Petitioner has found himself in the position of having to file this Rule 60(b) motion on behalf of his best interest and in the best interests of the integrity of these habeas corpus proceedings. See Gonzalez v. Crosby, 545 US 524, 162 L.Ed. 2d 480, 125 S.Ct. 2641 (2005) (Rule 60 appropriate in order to cure some defect in the integrity of the federal habeas proceedings); Banks v. U.S., 167 F.3d 1082 (7th Cir. 1999) (Rule 60(b) is, however, an appropriate means to bring a claim that the conduct of counsel affected the integrity of the court's habeas proceedings) Here, the record is clear, Petitioner's trial/appellate counsel was being investigated by the same office prosecuting him, Mr.

-38-

Horowitz was timely made aware and provided with documentary incontrovertible evidence and failed to act. In sum, now the record is silent and the integrity of these proceedings have been affected by Mr. Horowitz inactions. The record is also silent as to the motives had by Mr. Horowitz to resort to such a callous tactic in asking this Court to have the Petitioner submitted to psychological evaluation when he was asked by the Petitioner to raise this, at a minimum, embarrassing issue concerning his trial/appellate counsel. Was Mr. Horowitz involved in receiving referrals from Petitioner's trial/appellate counsel and was trying to stay out of the investigation himself? The Petitioner respectfully suggest that that may have been the motive but at this point it is not known...and it may remain in secrecy unless an evidentiary hearing is held.

Mr. Horowits did not file the necessary and appropriate objections to the R&R. For example, the R&R failed to take into consideration the new Brady elaborated test by Kyles v. Whitley, 514 U.S. 419, 131 L.Ed 2d 490, 115 S.Ct. 1555 (1995).

It is respectfully submitted that the R&R's conclusion regarding the sufficiency of the evidence, or as stated in the R&R "overwhelming evidence," is in contrast with the Supreme Court's holding in Kyles. Specially, because the R&R rely on the testimony of unreliable witnesses. That is, Ilvigio Hernandez admitted that he had lied to Florida State law enforcement agents. However, that was not an ordinary lie, that was a duly sworn

statement. Thus, outright perjury. Moreover, where did Ilvigio Hernandez committed perjury in the Florida State proceedings or in this Court? Second, Idania Arias did not identify the Petitioner for one year and a half. Even though under the pressure and suggestive tactics of state and federal agents showing her an array of pictures time after time, and time after time Idania Arias was not able to identify the Petitioner. In fact, Idania Arias had already made a <u>mistake</u> that kept another innocent man incarcerated for over a year. Moreover, Idania Arias testified in the sworn deposition that she had never seen the Petitioner, and that she knew that her four/five year old son had seen the Petitioner "because the police told her." (See ¶25 herein, supra) Nevertheless, Idania Arias after one and half years of not being able to identify the Petitioner as one of kidnappers, identified the Petitioner at trial. Was Idania Aria committing perjury motivated at obtaining leniency from the government who was investigating her? Again, Mr. Horowitz did not file a proper objection in this regard, and without an evidentiary hearing it would be impossible to find out.

Nelson Martin never identified the Petitioner as one of the kidnappers, and his wife was not present at his kidnapping. However, Idania Arias, her husband Jose Arias, Nelson Martin, and Mercedes Gomez had something in common. They were targets of federal investigations for having committed fraud against the United States. All of them but Nelson Martin, were later indicted and sentenced to prison. This is the overwhelming evidence relied

upon by the R&R. Furthermore, the R&R does not dispute the Brady violation, but once again, it found that the [violation] "...is of no import given the overwhelming evidence introduced at trial to support movant's convictions." (Id. at R&R, CIV-DE#46, p. 23)   The R&R erred here because "materiality" under Brady as elaborated by Kyles, is not sufficiency of the evidence test. Kyles, supra, at 514 U.S. 434-35.   According to the Supreme Court in Kyles, supra, the test is not whether the inclusion of withheld evidence would have resulted in different verdict, but "whether in the absence the defendant received a fair trial...resulting in verdict not worthy of confidence." Kyles, supra 514 U.S. 434.   In contrast here, the R&R makes its findings and conclusion pursuant to Chapman v. California, 386 U.S. 18 (1967), and fashioned a hybrid test pursuant to the "harmless beyond a reasonable doubt standard," (Id. at R&R, CIV-DE#46, p. 22) without applying Kyles, supra.   In contrast, Kyles, supra, held that "once materiality is established, harmless error analysis has no application. Kyles, at 514 U.S. 435, 436 (1995).   Thus, Mr. Horowitz failed again to conduct an in depth review of the R&R and the appropriate objections.

In sum, it appears that Mr. Horowitz' loyalties and interests was aim at somewhere else where he shared a conflict of interest that affected his performance.   Thus, a de novo review should be at hand.

III(f).

### PETITIONER'S SIXTH AND FIFTH AMENDMENT WERE VIOLATED WHEN COUNSEL AFFECTED BY A CONFLICT OF INTEREST DID NOT OBJECT TO THE USE OF VARIOUS STATE CONVICTIONS

The Supreme Court has held that a defendant's Fifth Amendment rights are violated when he is sentenced using prior felony convictions which was obtained without counsel representation. United States v. Tucker, 404 U.S. 443, 30 L.ED 2d 592, 92 S.Ct. 589 (1972), "[T]he Gideon case established an unequivocal rule 'making it unconstitutional to try a person for felony in state court unless he had a lawyer or had validly waived one'" [Citation omitted] (Emphasis in original), Tucker, supra at 404 U.S. 449. This Petitioner did not have a lawyer representing him in the state felony convictions, nor did he waived the right to be represented by one. However, the R&R did not found that Petitioner's trial/appellate counsel's failure to object at sentencing was not ineffective assistance of counsel. When counsel finally appealed this issue the Eleventh Circuit held that counsel's failure to raise the issue at sentencing waived the right to appeal it.

The Petitioner submits that, once again, his trial/appellate counsel's performance was affected by an actual conflict of interest. Thus, the Petitioner was sentenced to an additional number of years. Therefore, this Court should conduct a de novo review of Petitioner's sentence in this regard.

## IV.   CONCLUSION

WHEREFORE, for the reasons herein, the Petitioner prays that this Honorable Court will grant him a new trial, an evidentiary hearing to look into Petitioner's trial/appellate counsel's federal investigation which affected his performance in Petitioner's pre-trial, trial, and proceedings that followed.  In addition, any other relief deemed appropriate by the Court.

Respectfully submitted,


Eladio Munoz, pro se
Reg. 40857-004
Federal Correctional Institution
2680 Highway 301 South
Jesup, Georgia 31599


## V.  CERTIFICATE UNDER THE PENALTY OF PERJURY

I DECLARE UNDER THE PENALTY OF PERJURY under the law of the United States of America, Title 28 United States Code, Section 1746, that the foregoing is true and correct to the best of my knowledge. Signed on this 21 day of _July_, 2008.


By: _____
    Eladio Munoz, pro se


-43-

## VI.   CERTIFICATE OF SERVICE

I HEREBY CERTIFY, that a true and copy of the foregoing document was mailed this 21st day of July, 2008, to William T. Zloch, Assistant U.S. Attorney, at 500 Australian Ave., Suite 400, West Palm Beach, Florida 33401.

By: _____
      Eladio Munoz, pro se

# Memorandum



| Subject | Date |
|---|---|
| Possible Attorney Conflict in the Investigation of Miami Field Division Group 43 Special Agents | 6/7/2000 |

To

Vincent J. Mazzilli
Special Agent in Charge
Miami Field Division

From *[signature]*

Sandalio Gonzalez
Associate SAC 1
Miami Field Division

I recently read the attached articles published in the Miami Herald on May 21, 2000, and in the Colombian publication El Tiempo on May 25, 2000, regarding the investigation presently being conducted by the FBI and DEA/OPR involving informants and agents of Miami Field Division Group 43. In view of what was printed in the articles and of other knowledge we possess about some of the individuals involved, I recommend that you provide the information that follows to the appropriate officials in OPR, the FBI, and the Department of Justice.

Although I've never been fully briefed on the FBI/OPR case, as far as I know this affair deals with activities conducted under DEA Operation CALIMAN, a Group 43 SARC approved money-laundering investigation. The articles identify Nelson Rodriguez-Varela as a defense attorney representing Baruch Jairo Vega, a CALIMAN informant now charged with money laundering and obstruction of justice along with fellow Group 43 informant Roman Suarez-Lopez. According to the articles, Vega and Suarez conjured up "phony cooperation deals" with indicted and suspected Colombian drug lords, as DEA agents waited in adjoining hotel rooms.

In connection with my duties as Associate SAC, I have learned over the past year that Mr. Rodriguez-Varela is a close associate of another Miami defense attorney by the name of Joaquin Perez. Mr. Rodriguez and Mr. Perez reportedly practice law out of the same office, share the same secretary, and usually share co-defendants. Mr. Perez is presently the attorney of record for Nicolas Bergonzoli, a high level Colombian trafficker and target of Group 43 under CALIMAN. Several months ago Bergonzoli surrendered to Group 43 and was released following a cooperation agreement approved by the Office of the United States Attorney for the Southern District of Florida. Mr. Bergonzoli is scheduled for sentencing in the near future.

The relationship between Rodriguez-Varela and Perez is spelled out in the attached DEA-6 dated 5-27-99 by SA Russell Davis, under file number G1-98-0373. This report, which concerns a debriefing of cooperating defendant Orlando Garcia, which took place in the presence of two federal

"Exhibit A"

Vincent J. Mazzilli                                              Page 2
6/7/2000

prosecutors, states that Rodriguez-Varela and Perez "share the same law
office". The report also states that Garcia asked the DEA agents and
federal prosecutors if Rodriguez-Varela could be relieved as his attorney
because of his relationship with Joaquin Perez. When Garcia was arrested
in November of 1998, Perez was representing Garcia's co-defendants, whom
Garcia later fingered for allegedly devising a plan to blame law
enforcement officers for stealing ten kilograms of cocaine.

I also learned of another DEA case in West Palm Beach where Rodriguez-
Varela and Joaquin Perez represented defendants. The case agent, SA Dan
Bruce, told me that the circumstances involving the actions of these two
lawyers in that particular case were in his view "suspicious". I did not
pursue the matter with SA Bruce.

The issue, as I see it, is that Nelson Rodriguez-Varela, who represents
CALIMAN informant and now federal defendant Baruch Vega in a case also
involving his DEA handlers, reportedly shares an office and a secretary
with Joaquin Perez, who represents CALIMAN defendant Nicolas Bergonzoli,
whose surrender to DEA was arranged by Vega. If true, the apparent
financial interdependence and close working relationship of these defense
attorneys is a kind of defacto partnership which creates a conflict in
this case, or at the very least an appearance of impropriety, because it
is highly probable that they are material witnesses to the investigation
and any subsequent charge involving the two DEA agents.

As an example, both of these gentlemen have material information
regarding communications between the agents and their clients, as well as
the Vega/Bergonzoli connection and how the surrender/cooperation
agreement came to fruition. I have been told it is common knowledge in the
Miami legal community that Joaquin Perez gets multi-defendant drug
cases and parcels out the defendants to various lawyers in his office
building in order to maintain control of both the cases and the
defendants. This seems to be a pattern that rears its head in this case,
and warrants close scrutiny by investigators and prosecutors.

In sum, I am particularly concerned that we have a pair of defense
attorneys, one representing a CALIMAN defendant (Bergonzoli), and the
other a CALIMAN informant (Vega) who may be looking for a sweetheart plea
deal perhaps at the expense of our two agents, and that these two
attorneys may in essence be controlling both sides of the equation in
furtherance of their defacto partnership. It is a definite advantage to
control both informant and target since this also lends itself to a very
profitable situation. These attorneys appear to represent and profit from
both Bergonzoli and Vega, and perhaps others, with our agents unwittingly
caught in the middle.

**E L A D I O   M U N O Z**
Reg. No.40857-004

Federal Correction Institution Jesup
2680 Highway 301 South
Jesup, Georgia 31599

**August 7, 2006**

Philip Horowitz
Attorney at Law
9130 S. Dadeland Boulevard
Suite 1910
Miami, Florida 33156

In re:  **Eladio Munoz v. U.S., Case No. 05-23260-Civ-Gold (96-443-Cr-Gold)**

Dear Mr. Horowitz:

I hope upon receiving this letter you will be enjoying the best of health and spirits. I am writing you because I have been informed by the district court that you have been appointed to represent me in the evidentiary hearing and related proceedings in the above captioned case. To this end and very respectfully, I would like you to be aware that I have been fighting my case pro se, and that I would like to remain involved and have an input in my case. Thus, please keep me inform at all times about whatever steps you take on my behalf and send me copies of whatever you file. In addition, there are a number of things that I am asking you consider filing: (1) discovery motion pursuant to the Rules Governing § 2255, requesting information pertaining to the investigation conducted by the government that led to the later indictment of the witnesses Idania Cecilia Arias, Mercedes Gomez and Nelson Martin, used by the government against me at trial; (2) information of the investigation of my attorney by the government during the course of my proceedings. It appears that my attorney, Joaquin Perez, was being investigated by the government in the Ochoa case during my proceedings; (3) the filing of subpoenas for Idania Cecilia Arias, Mercedez Gomez, Nelson Martin and AUSA Jennifer Prior. Idania C. Arias and Mercedez Gomez, I have been told they are still serving time. I do not know if the same is true for Nelson Martin.

The subpoenas for these individuals are important because, in the case of the witnesses, they testified that they were not being investigated by the government at the time of my proceedings. In the case of AUSA Jennifer Prior, she told the court the same thing. However, I discovered later that the government was investigating these witnesses from 1992 to 2000. The investigation, Indictment and the trial in my case began in 1996 and ended in 1998, when my trial was held. As you can see, this

*"Exhibit B"*

Munoz, E.
Letter to Horowitz, P.
Page 2.

information is very important.  I am also asking you to consider
filing a motion requesting the recusal of AUSA Jennifer Prior,
since she is going to be subpoena to testify in the evidentiary
hearing about her assurances that the witnesses were not being
investigated by the government. Indeed, AUSA Jennifer Prior seems
to be guilty of subordination of perjury and government misconduct
for bustering the witnesses' credibility when she knew they were
being investigated for having committed federal crimes.  Did AUSA
Prior and the witnesses have any secret deal for leniency?  Please
make sure these subpoenas are filed with the district court and in
accord with the Code of Federal Regulations.

        For your courtesy and consideration in this matter, I thank
you in advance.

Sincerely,



Eladio Munoz


gs/
cc:  on file

```
                         EADIO MUNOZ
                         40857-004
                         FDC MIAMI
                       P.O. BOX 019120
                    MIAMI, FL  33101-9120
```

October 20, 2006

Law Offices of
Philip R. Horowitz
Two Datran Center
9130 South Dadeland Blvd. Suite 1910
Miami, FL  33156

Re:  Case No. 05-23260-Civ-Gold
     (96-443-cr-gold)
     Magistrate Judge P.A. White
     REQUEST FOR SUBPOENAS

Dear Mr. Horowitz,
     I am writing this letter to request that you prepare and issue subpoenas
for the following people to testify as witnesses in my defense of the above-captioned
case:
     1 - Attorny (former AUSA) Jennifer Prior Brown - Florida Bar No. 793337
         Andrew lourie - AUSA
         Juaquin Perez
         Joshua Silverman - AUSA - Court No. A5500218
         Nelson Martin
     2 - Mercedes Gomez          **PS I want you to prepare and file a motion pursuant
     3 - Idania C. Arias         to Brady v Maryland to vacate the judgment in
         Ilvigio Hernandez       my case.**

Thank you for your assistance.


                              Sincerely,



                              Eladio Munoz

IN THE STATE OF FLORIDA COUNTY OF DADE, TO WIT:

Swor and subscribed before me this 25th day of October, 2006


Notarized By: _____


Signed _____
```

OFFICIAL NOTARY SEAL
ARLENE MCDUFFEY
NOTARY PUBLIC STATE OF FLORIDA
COMMISSION NO. DD...
MY COMMISSION EXP. JAN...

"Exhibit C"